UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IRMA P. G.,[1]

               Plaintiff,

     v.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

               Defendant.

Case No. 2:20-cv-09841-JC

MEMORANDUM OPINION AND ORDER OF REMAND

## I.   SUMMARY

On October 27, 2020, plaintiff Irma P. G. filed a Complaint seeking review of the Commissioner of Social Security's denial of plaintiff's application for benefits.  The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion")

---

[1]Plaintiff's name is partially redacted to protect her privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

1  (collectively "Motions").  The Court has taken the Motions under submission

2  without oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; May 10, 2021 Case

3  Management Order ¶ 5.

4       Based on the record as a whole and the applicable law, the decision of the

5  Commissioner is REVERSED AND REMANDED for further proceedings

6  consistent with this Memorandum Opinion and Order of Remand.

7  **II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE**

8  **DECISION**

9       On January 23, 2018, plaintiff filed applications for Supplemental Security

10  Income and Disability Insurance Benefits, alleging disability beginning on

11  November 11, 2016, due to cervical pain and radiculopathy, upper extremity

12  numbness, low back and right leg numbness, loss of concentration, migraines, and

13  depression.  (Administrative Record ("AR") 213-27, 255).  The Administrative

14  Law Judge ("ALJ") examined the medical record and heard testimony from

15  plaintiff (who was represented by counsel) and a vocational expert.  (AR 15-35,

16  41-71).

17       On July 29, 2020, the ALJ determined that plaintiff was not disabled

18  through the date of the decision.  (AR 15-35).  Specifically, the ALJ found:

19  (1) plaintiff suffered from the following severe impairments:  C6-C7 cervical

20  degenerative disc disease with radiculopathy (status post surgery) with bilateral

21  upper extremity numbness and pain, and sciatica (status post surgery) (AR 17-26);

22  (2) plaintiff's impairments, considered individually or in combination, did not

23  meet or medically equal a listed impairment (AR 26); (3) plaintiff retained the

24  residual functional capacity to perform light work (20 C.F.R. §§ 404.1567(b),

25  416.967 (b)) with additional limitations[2] (AR 26-34); (4) plaintiff is capable of

26

27       [2]The ALJ determined that plaintiff:  (1) could lift or carry 10 lbs. frequently and 20 lbs.
28  occasionally; (2) could sit, stand or walk up to 6 hours in an 8 hour workday, with normal breaks;
(continued...)

2

1  performing her past relevant work as an administrative clerk as generally

2  performed (AR 34 (adopting vocational expert testimony at AR 64-67)); and

3  (5) plaintiff's statements regarding the intensity, persistence, and limiting effects

4  of her subjective symptoms were not entirely consistent with the medical evidence

5  and other evidence in the record (AR 28).

6      On September 24, 2020, the Appeals Council denied plaintiff's application

7  for review.  (AR 1-3).

8  **III.    APPLICABLE LEGAL STANDARDS**

9          **A.    Administrative Evaluation of Disability Claims**

10     To qualify for disability benefits, a claimant must show that she is unable

11  "to engage in any substantial gainful activity by reason of any medically

12  determinable physical or mental impairment which can be expected to result in

13  death or which has lasted or can be expected to last for a continuous period of not

14  less than 12 months."  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012)

15  (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded

16  by regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606

17  (9th Cir. 2020); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To be considered disabled,

18  a claimant must have an impairment of such severity that she is incapable of

19  performing work the claimant previously performed ("past relevant work") as well

20  ///

21

22  _____

23      [2](...continued)

    (3) could frequently push or pull, including the use of hand and foot controls; (4) could

24  occasionally use ramps or stairs; (5) could not use ladders, ropes, or scaffolds; (6) could not reach
    overhead bilaterally; (7) could frequently handle or finger with the left, non-dominant hand;

25  (8) must avoid concentrated exposure to vibrations, unprotected heights, and workplace hazards;
    (9) could look down and see her shoes but not her waist so as to see a belt; and (10) needed to

26  rotate at the waist when driving even short distances to use side mirrors due to limited flexion
    and extension of her neck.  (AR 26 (adopting capacity consistent with state agency physicians'

27  residual functional capacity assessments from April/July 2018 at AR 83-85, 99-101, 116-18, 131-

28  33)).

1  as any other "work which exists in the national economy." <u>Tackett v. Apfel</u>, 180
2  F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

3        To assess whether a claimant is disabled, an ALJ is required to use the five-
4  step sequential evaluation process set forth in Social Security regulations. <u>See</u>
5  <u>Stout v. Commissioner, Social Security Administration</u>, 454 F.3d 1050, 1052 (9th
6  Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R.
7  §§ 404.1520, 416.920). The claimant has the burden of proof at steps one through
8  four – *i.e.*, determination of whether the claimant was engaging in substantial
9  gainful activity (step 1), has a sufficiently severe impairment (step 2), has an
10 impairment or combination of impairments that meets or medically equals one of
11 the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings")
12 (step 3), and retains the residual functional capacity to perform past relevant work
13 (step 4). <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).
14 The Commissioner has the burden of proof at step five – *i.e.*, establishing that the
15 claimant could perform other work in the national economy. <u>Id.</u>

16       **B.**    **Federal Court Review of Social Security Disability Decisions**

17       A federal court may set aside a denial of benefits only when the
18 Commissioner's "final decision" was "based on legal error or not supported by
19 substantial evidence in the record." 42 U.S.C. § 405(g); <u>Trevizo v. Berryhill</u>, 871
20 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted). The
21 standard of review in disability cases is "highly deferential." <u>Rounds v.</u>
22 <u>Commissioner of Social Security Administration</u>, 807 F.3d 996, 1002 (9th Cir.
23 2015) (citation and quotation marks omitted). Thus, an ALJ's decision must be
24 upheld if the evidence could reasonably support either affirming or reversing the
25 decision. <u>Trevizo</u>, 871 F.3d at 674-75 (citations omitted). Even when an ALJ's
26 decision contains error, it must be affirmed if the error was harmless. <u>See</u>
27 <u>Treichler v. Commissioner of Social Security Administration</u>, 775 F.3d 1090,
28 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate

1   nondisability determination; or (2) ALJ's path may reasonably be discerned
2   despite the error) (citation and quotation marks omitted).

3          Substantial evidence is "such relevant evidence as a reasonable mind might
4   accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining
5   "substantial evidence" as "more than a mere scintilla, but less than a
6   preponderance") (citation and quotation marks omitted).  When determining
7   whether substantial evidence supports an ALJ's finding, a court "must consider the
8   entire record as a whole, weighing both the evidence that supports and the
9   evidence that detracts from the Commissioner's conclusion[.]" Garrison v.
10  Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

11         Federal courts review only the reasoning the ALJ provided, and may not
12  affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely."
13  Trevizo, 871 F.3d at 675 (citations omitted).  Hence, while an ALJ's decision need
14  not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's
15  reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin,
16  806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

17         A reviewing court may not conclude that an error was harmless based on
18  independent findings gleaned from the administrative record. Brown-Hunter, 806
19  F.3d at 492 (citations omitted).  When a reviewing court cannot confidently
20  conclude that an error was harmless, a remand for additional investigation or
21  explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173
22  (9th Cir. 2015) (citations omitted).

23  **IV.   DISCUSSION**

24         Plaintiff contends, *inter alia,* that the ALJ erred in considering plaintiff's
25  statements and testimony concerning plaintiff's limitations.  See Plaintiff's Motion
26  at 2-10.  For the reasons discussed below, the Court agrees.

27  ///

28  ///

1

### A.    Summary of the Relevant Medical Evidence

2    The available medical treatment record since 2016 primarily consists of
3  records from three sources:  several primary care and urgent care providers at High
4  Desert Medical Group, two neurosurgeons at Antelope Valley Neuroscience
5  Medical Group, and one provider at Avors Medical Group.  As detailed below,
6  the records reflect fairly consistent complaints of cervical pain both before and
7  after plaintiff underwent surgery for cervical disc disease, and some imaging to
8  support ongoing issues although the record appears to be incomplete.

9    Plaintiff complained to a primary care provider at High Desert Medical
10  Group about neck pain on April 27, 2016, reporting chronic moderate burning
11  neck pain radiating to her right shoulder that onset two months prior.  (AR 442).
12  Plaintiff was taking Vicodin which was not helping.  (AR 442).  On examination,
13  she had severe cervical pain with motion and her doctor diagnosed neck
14  pain/cervical radiculopathy.  (AR 442, 444).

15    At her next primary care visit on August 15, 2016, plaintiff complained of
16  neck pain and headache, stating that her neck pain had been ongoing for years.
17  (AR 446; see, e.g., AR 827 (March, 2014 note reporting complaints of neck and
18  shoulder pain), AR 842 (August, 2013 note reporting neck pain), AR 847 (May,
19  2013 note reporting neck pain)).  Her provider diagnosed cervical degenerative
20  disc disease with radiculopathy and foraminal stenosis (per MRI), referred
21  plaintiff for neurosurgery, and gave plaintiff a note to be off work.  (AR 446,
22  449).[3]

23

24    [3]A May 2016 cervical spine MRI study showed:  (1) reversal of the cervical lordosis
25  suggesting spasm and/or degenerative changes; (2) 1-mm anterolisthesis of C3-C4 and C4-C5,
   1-mm retrolisthesis of C6-C7 and C7-T1; (3) disc dessication from C2-C3 to C6-C7 with
26  moderate disc space narrowing at C4-C5 and C5-C6, and moderate-to-severe narrowing at C6-C7
   and C7-T1; (4) at C3-C4, minimal anterolisthesis but severe left facet arthropathy and bilateral
27  uncovertebral hypertrophy causing moderate-to-severe left foraminal stenosis, which may affect
28  the exiting left C4 nerve root; (5) at C4-C5, minimal anterolisthesis but severe right and

(continued...)

6

On November 16, 2016, plaintiff returned reporting that her neck pain had worsened to being constant/severe with some numbness.  (AR 459).  On examination, she had muscle spasm and severely reduced cervical spine range of motion, so she was given a Toradol injection and referred for a second neurosurgeon opinion.  (AR 461).  Her stenosis notedly was leading to bilateral upper extremity weakness.  (AR 461).

On November 21, 2016, plaintiff presented to Dr. Thomas Nasser with Avors Medical Group for chronic pain in her neck, right leg, shoulders, hands and headaches, upon referral from her primary care doctor.  (AR 1205).  Dr. Nasser reviewed plaintiff's cervical spine MRI and diagnosed cervical stenosis, spondylosis, and radiculitis.  (AR 1207).  Plaintiff's physical examination, however, notes "no impairments."  (AR 1206).  Dr. Nasser recommended facet block injections.  (AR 1207).

On December 9, 2016, plaintiff returned to her primary care provider to fill out disability forms.  (AR 464).  On examination, she notedly had moderate pain with cervical spine motion.  (AR 466).

On December 21, 2016, plaintiff presented for an initial neurosurgery consultation with Dr. Mukesh Misra at Antelope Valley Neuroscience Medical Group, complaining of neck, shoulder, and arm pain and grip issues, worsened by

---

[3](...continued)
moderate left facet arthropathy, and bilateral uncovertebral hypertrophy causing moderate-to-severe right and mild left foraminal stenosis, which likely affects the exiting right C5 nerve root; (6) at C5-C6, a 2-mm disk osteophyte complex with bilateral uncovertebral hypertrophy causing moderate left and mild-to-moderate right foraminal stenosis; (7) at C6-C7, a 2-mm disk osteophyte complex causing mild-to-moderate spinal canal stenosis, with mild left facet arthropathy and bilateral uncovertebral hypertrophy causing moderate-to-severe left foraminal stenosis, which likely affects the exiting left C7 nerve root; (8) at C7-T1, a 2-mm disk osteophyte complex with 2-mm right paracentral disk protrusion without spinal canal stenosis, with mild left facet arthropathy and bilateral uncovertebral hypertrophy causing moderate-to-severe left without right foraminal stenosis, which likely affects the exiting left C8 nerve root.  (AR 516-17).

physical therapy and not relieved by a steroid block, for which she would be given pain medications and muscle relaxants and a cervical block to try before considering surgery. (AR 531, 534). On examination, plaintiff reportedly had mild decreased left grip strength and otherwise motor strength of 5/5, decreased left C5 sensation, but a normal gait. (AR 533). Plaintiff underwent a cervical facet block on January 27, 2017. (AR 545-46).

On March 21, 2017, plaintiff returned to her primary provider complaining of suffering from anxiety "for a while" for which her primary doctor prescribed Xanax and referred plaintiff to psychiatry. (AR 476, 478). Plaintiff requested a note to remain off work. (AR 479).

Plaintiff followed up with Dr. Misra on March 30, 2017, reporting she was doing "much better" after her facet block, so the plan was to continue plaintiff's pain management and repeat the block when due. (AR 557). On examination, plaintiff again had mild decreased left grip strength and otherwise motor strength of 5/5, decreased left C5 sensation, but a normal gait. (AR 558). Dr. Misra also referred plaintiff for physical therapy. (AR 560-61; see also AR 958-66 (physical therapy notes)).[4]

On June 28, 2017, plaintiff returned to Dr. Misra reporting continued neck, shoulder, and arm pain, and now buttock and leg pain, and that her low back pain and numbness was getting worse, for which she was referred for MRI studies. (AR 573, 576). On examination, plaintiff had mild decreased left grip strength and otherwise motor strength of 5/5, decreased left C5 and left L4-L5 sensation, but a normal gait and positive "slr" (straight leg raising). (AR 575).

On August 23, 2017, plaintiff returned to Dr. Misra complaining of continued pain and reporting that pain medications and injections were not

---

[4]Dr. Misra provided a Disability and Accommodation Worksheet dated March 30, 2017, stating that for the "short term" (*i.e.*, 90 days or less), plaintiff could not lift over 25 pounds, twist, bend, or repetitively overhead reach (AR 549-51).

working well.  (AR 504).  She reportedly exercised regularly.  (AR 504).  On examination, plaintiff again had mild decreased left grip strength and otherwise motor strength of 5/5, decreased left C5 and L4-L5 sensation, but normal gait and positive straight leg raising.  (AR 505).  Dr. Misra diagnosed cervical radiculopathy that had deteriorated and prescribed Norco.  (AR 505, 593).

On December 11, 2017, plaintiff underwent cervical decompression and fusion surgery by Dr. Misra.  (AR 405-17, 609-24, 642-43, 977-94 (surgery records)).[5]  Plaintiff had a post-operative visit with Dr. Misra on December 21, 2017, where she complained of neck and bilateral arm pain, but also reportedly said that she was "doing better."  (AR 500).  On examination, plaintiff had improved motor strength of 5/5, improved left C5 sensation, normal gait and positive straight leg raising.  (AR 501).  Dr. Misra reported that plaintiff's cervical radiculopathy had improved and prescribed a Medrol pack.  (AR 501).

Plaintiff followed up with her primary provider on December 26, 2017, and she was tender on examination with moderately reduced cervical spine range of motion.  (AR 487, 489).  Plaintiff returned to her primary provider on January 11, 2018, complaining of right shoulder pain with right upper extremity weakness, radiating down her arm.  (AR 493).[6]  On examination, she had tenderness to palpation of the right shoulder and muscle spasm in her neck.  (AR 495).  She reportedly had "fair control" of her cervical radiculopathy for which she was prescribed Lyrica, and she was assessed with biceps tendinitis, also with "fair control," for which she was to use ice and heat.  (AR 495).

///

---

[5]At her pre-operative clearance evaluation with her primary doctor on December 6, 2017, plaintiff notedly was independent and "stable/good" with her activities of daily living, with "100%" "functional status."  (AR 723).

[6]A January 2018 right shoulder x-ray showed mild degenerative changes in the acromioclavicular joint with joint space narrowing and subchondral sclerosis.  (AR 507).

1    On January 18, 2018, plaintiff followed up with Dr. Misra complaining of
2    right shoulder and right hand pain for which she was given a Medrol pack. (AR
3    497). On examination, plaintiff again reportedly had improved motor strength of
4    5/5, improved left C5 sensation, normal gait and positive straight leg raising. (AR
5    498). Similarly, at a January 22, 2018, cardiology visit plaintiff reported that she
6    was in pain after her discectomy, but on examination her back/spine inspection
7    was normal and she had a normal gait and no weakness. (AR 384-87).

8    On February 14, 2018, plaintiff returned to Dr. Misra complaining of neck,
9    shoulder, and right arm pain, and depression, and reporting that she was applying
10   for permanent disability. (AR 1074). On examination, plaintiff again had
11   improved motor strength of 5/5, improved left C5 sensation, a normal gait and
12   positive straight leg raising. (AR 1075). Dr. Misra referred plaintiff for physical
13   therapy and prescribed Amytryptaline. (AR 1074-75, 1077).

14   Consultative examiner Dr. Valene J. Gresham prepared a psychological
15   evaluation dated March 3, 2018, finding none-to-mild mental impairments. (AR
16   1039-42). Plaintiff reported that she was married and lived with her family and
17   could manage her activities of daily living, but she had some difficulty with
18   activities that require her to lift her right shoulder due to pain. (AR 1040). She
19   could do household chores and her granddaughter assisted with most of the
20   housework. (AR 1040). Plaintiff had a normal gait. (AR 1040).

21   Plaintiff presented to urgent care on April 14, 2018, complaining of neck
22   pain and requesting a Toradol shot that she was given. (AR 1126, 1129). Her
23   cervical spine was tender on examination. (AR 1128).

24   On May 8, 2018, plaintiff presented to her primary provider complaining of
25   severe mid-back pain and joint pain in her arms and left leg, and that her neck
26   symptoms never went away after surgery. (AR 1121). She was assessed with
27   acute cervical pain and athralgias and referred for arthritis testing. (AR 1124).
28   ///

On May 9, 2018, plaintiff returned to Dr. Misra complaining of neck pain, bilateral shoulder and low back pain, she reportedly said that she had "been better" since her surgery but "still has pain on and off," her pain medication requirement was stable, and she was still in the process of getting permanent disability. (AR 1103). On examination, plaintiff again had improved motor strength of 5/5, improved left C5 sensation, a normal gait and positive straight leg raising. (AR 1104).

On May 17, 2018, plaintiff returned to her primary provider complaining of bilateral leg pain with some numbness in her knee, depression, and sleeplessness. (AR 1115). On examination, she notedly had cervical spine muscle spasm and moderate pain with range of motion, and tenderness/moderate pain with left knee range of motion. (AR 1118). She was referred to psychiatry and for a left knee x-ray. (AR 1118-19).[7]

On June 13, 2018, plaintiff returned to her primary provider for diabetes follow up and she reportedly had 11 out of 18 tender points on examination but a normal gait. (AR 1172, 1174). She was assessed with fibromyalgia and referred for physical therapy. (AR 1175).[8]

Plaintiff returned to Dr. Misra on July 26, 2018, complaining of neck pain, bilateral shoulder pain, and right arm pain. (AR 1329). It had been over six months since her surgery yet she continued to have pain. (AR 1329). Plaintiff reportedly said she was "better" but her right arm and neck still bother her. (AR 1329). Her pain medications were working and she was applying for disability. (AR 1329). Dr. Misra ordered a cervical spine MRI to evaluate plaintiff's persistent pain. (AR 1329). On examination, plaintiff again reportedly had

///

---

[7]May 2018 left knee x-rays were normal. (AR 1153).

[8]There are no subsequent mentions of fibromyalgia in the record.

11

improved motor strength of 5/5, improved left C5 sensation, normal gait and positive straight leg raising.  (AR 1330).

Plaintiff returned to one of Dr. Misra's colleagues, Dr. Abdallah Farrukh, on August 27, 2018, complaining of muscle weakness and pain, including pain in her right knee with tingling, that was preventing her from even doing gardening.  (AR 1326).  On examination, plaintiff had hyperesthesia pain and needles sensation in the head, forearm, lateral knee, lateral leg and distal thigh on the right side, no atrophy in her arms but some pain, significant weakness in the biceps and triceps, pain and muscle weakness on extension of the legs, throbbing lumbar spine pain radiating on both legs but more on the left, hyperreflexia in both knees, painful neck extension, and left arm rotation numbness.  (AR 1326).  A June (or July) 2017 cervical spine MRI (which is not in the record) reportedly showed: (1) straightening of the normal cervical lordosis; (2) a 1-2-mm degenerative posterior subluxation of C7 on T1, with moderate-to-severe disc space height loss and disc dessication at C7-T1 with degenerative end plate changes; (3) disc dessication at T1-T2 through T4-T5; (4) at C2-C3 ankylosis of the right facet joint; and (5) at C3-C4 mild bilateral uncovertebral osteophytes and facet arthropathy.  (AR 1326).  Dr. Farrukh diagnosed right tennis elbow, and recommended a cervical CT scan and x-ray and right elbow MRI, and a upper extremity EMG/NCV study.  (AR 1326, 1328).[9]

---

[9]An August 2018 cervical spine MRI showed status post anterior discectomy with fusion at C3-C4 through C6-C7, with no significant interval change in multilevel neural foraminal stenosis at the C3-C4 through C7-T1 levels, and multilevel facet and uncovertebral osteoarthropathy.  (AR 1157-58).  This study references a July 27, 2017 prior MRI study but that is not a part of the record.  See AR 1157 (referencing same).

A September 2018 cervical spine CT showed mimimal 1-2-mm retrolisthesis of C7 on T1, no central canal stenosis or foraminal narrowing, except for C5-C6 which had mild central canal narrowing, C6-C7 which had mild central canal stenosis with mild right and moderate left
(continued...)

1    Plaintiff presented to urgent care on September 13, 2018, for acute bilateral
2   low back pain without sciatica onset four days earlier.  (AR 1169-71, 1263).
3   Visual examination of her extremities was normal.  (AR 1265).  She was given a
4   Toradol injection and referred to her primary doctor.  (AR 1266-67).

5    Plaintiff presented to her primary provider on October 24, 2018, for diabetes
6   follow up, and she was assessed with chronic neuropathic pain and prescribed
7   Amitriptyline, and a mood disorder and referred to psychiatry.  (AR 1155-56,
8   1357-61).  There are no examination findings for this visit.

9    On December 14, 2018, plaintiff returned to Dr. Farrukh complaining of
10  cervical spine pain that did no go away after her surgery, mild lower back pain,
11  and hand weakness.  (AR 1323).  On examination, plaintiff was able to walk on
12  toes and heels, had a pinched nerve in her neck, and was unable to raise her right
13  shoulder due to pain, so she was given a shoulder trigger point injection.  (AR
14  1323).  Thoracic and lumbar spine MRIs (which are not in the record) reportedly
15  showed mild disc disease at L2-L3 and L5-S1.  (AR 1323).

16   On March 25, 2019, plaintiff returned to Dr. Farrukh complaining of neck
17  pain radiating to her shoulder, mostly on the left, and back and leg pain, helped by
18  pain management.  (AR 1318).  Plaintiff had not had any epidural injections.  (AR
19  1318).  On examination, she had radiculopathy at C6 and C7 per EMG (which was
20  not in the record before the ALJ, see Plaintiff's Motion, Ex. 1 (November 2018
21  upper extremity EMG study)), no evidence of neuropathy, inability to walk on toes
22  ///
23  ///
24
25
(...continued)
26  neural foraminal narrowing, and C7-T1 which had severe degenerative disc disease with bilateral
27  facet arthropathy and mild left neural foraminal narrowing.  (AR 1159-60).
28   A September 2018 right elbow MRI showed moderate tendinosis.  (AR 1166-67).

13

1  and heels, right leg pain, and left knee pain.  (AR 1318).[10]  Dr. Farrukh
2  recommended cervical transforaminal injections at C6-C7.  (AR 1318).

3      On April 24, 2019, plaintiff returned to Dr. Farrukh complaining of neck
4  pain radiating to her shoulders and arms, and low back pain radiating to her legs,
5  with her mostly feeling shoulder pain for which she wanted an injection.  (AR
6  1309).  She reported a loss of sensation in an area of her right knee, back pain and
7  tenderness mostly on the right side radiating down her right leg to the knee, but
8  she could ambulate without assistance.  (AR 1309).  On examination, plaintiff had
9  tenderness on neck rotation, positive Spurling maneuvers, a positive EMG, and
10  inability to bring her left arm above her head due to a pinched nerve in her neck
11  for which cervical decompression from C5-C7 was recommended.  (AR 1309).
12  She was given a left shoulder injection.  (AR 1309).

13      On May 28, 2019, plaintiff returned to Dr. Farrukh complaining of neck
14  pain radiating to her arms, an injury to her right leg from stretching, low back pain
15  on the right side, some depression and anxiety, but pain medication keeps the pain
16  tolerable and she could ambulate without assistance.  (AR 1304).  Dr. Farrukh
17  assessed lumbar and cervical radiculopathy.  (AR 1305-06).  Dr. Farrukh
18  recommended plaintiff start going to physical therapy, continued pain

19

20      [10]It appears that the EMG study was not presented before these proceedings.  See AR 26
21  (ALJ's decision noting that the EMG was not in evidence).  Plaintiff discussed it at the hearing
and the ALJ afforded plaintiff's counsel time to submit additional records.  See AR 56, 69.  The
22  ALJ's decision states that plaintiff's counsel subsequently reported that the file was complete.
23  See AR 15 (citing AR 322); see also AR 45 (indicating that the record at the time of the hearing
went through Exhibit 20F, the last record in the administrative file).
24

25      The EMG study showed chronic bilateral C6 and C7 radiculopathy, chronic denervations
in the paraspinal muscles between C5-C6 and C6-C7, no evidence of peripheral neuropathy, and
26  suggests plaintiff's recurrent pain is due to neural foraminal stenosis.  (Plaintiff's Motion, Ex. 1)
27  Although the ALJ did not have the benefit of this study, the ALJ noted record reports of cervical
degenerative disc disease with radiculopathy both before and after plaintiff's surgery.  See AR
28  20, 22 (ALJ discussing same).

management, and a cervical laminectomy from C5-C7 to reduce cervical pain. (AR 1304).[11]

Plaintiff presented to her primary provider on June 3, 2019, for depression and chronic pain, reporting that she was unable to be seen per the prior psychiatrist referral. (AR 1250). On examination, she had cervical spine tenderness and pain with range of motion and hopelessness. (AR 1253). She was given an injection for her neck pain, and prescribed Prednisone and Lexapro. (AR 1253-54).

On July 4, 2019, plaintiff returned to Dr. Farrukh complaining of neck pain radiating to her shoulders and arms, made tolerable with medication, lower back pain, anxiety and depression. (AR 1186). On examination, she reported tingling in her back, had pain with cervical flexion and extension, pain on right straight leg raising, but her muscle tone was within normal limits. (AR 1186). She reportedly was able to perform activities of daily living with the aid of medication. (AR 1186). Dr. Farrukh continued her pain management and referred her for a lumbar epidural injection for lumbar radiculopathy. (AR 1186, 1188).

On July 30, 3019, plaintiff returned to her primary provider for low back pain radiating to the right leg due to a "pinched nerve." (AR 1244). She had mild osteoarthritis in her hands and a normal gait on examination. (AR 1247).

On July 31, 2019, plaintiff returned to Dr. Farrukh for low back pain with soreness, made tolerable by medication, and reporting that she fell in the parking lot. (AR 1294). On examination, she had no fracture and straight leg raising was negative. (AR 1294). Dr. Farrukh continued plaintiff's pain management. (AR 1294).

On September 18, 2019, plaintiff returned to Dr. Farrukh complaining of neck and low back pain, helped by medication, and left shoulder pain. (AR 1276). She reportedly ambulated without assistance. (AR 1276). On examination, her

---

[11]Plaintiff attended physical therapy twice in August 2019. (AR 1287-92).

1  pain control reportedly was good, with plaintiff stating that her medication makes

2  her more functional.  (AR 1276).  Dr. Farrukh diagnosed cervical spondylosis

3  without myelopathy and continued plaintiff's medications.  (AR 1277-78).

4         Plaintiff had a lumbar epidural injection on October 22, 2019.  (AR 1189,

5  1202).  On November 6, 2019, plaintiff returned to Dr. Farrukh  complaining of

6  constant neck and lower back pain with sciatica, helped by medication, with some

7  tingling in her left foot.  (AR 1269).  She reportedly had been experiencing

8  bladder dysfunction while working out.  (AR 1269).  Plaintiff also reported

9  anxiety and feeling incapable of returning to work due to pain.  (AR 1269).

10  Examination showed limited neck rotation with pain and limited lumbar flexion

11  and extension.  (AR 1269).  Dr. Farrukh diagnosed sciatica, cervical radiculitis,

12  and lower extremity weakness,[12] and recommended continued pain management

13  and lumbar epidural steroid injections.  (AR 1269-71).  Although plaintiff still

14  reportedly was able to perform activities of daily living with medication, Dr.

15  Farrukh ordered a walker for lower extremity weakness.  (AR 1269, 1271).[13]

16  ///

17

18  ───────────────

19  [12]When plaintiff testified at the hearing on February 4, 2020, she did not claim to have
    any pain or weakness in her legs.  She testified about upper mid-back, shoulder and upper

20  extremity pain only.  See AR 47-53, 55-60.

21  [13]Dr. Farrukh  provided a note dated November 6, 2019, which states:

22  To Whom it may concern

23
    Patient has been suffering from neck pain, back pain with sciatica[,] patient has
24  had neck and back surgery, and currently undergoing pain management, with
    potential need for further spinal surgery[,] patient has significant restriction of
25  range motion in cervical spine and lumbar spine, patient has objective findings of
    sciatica[.]  It is my opinion that patient is completely disabled, and will remain
26  completely disabled for a year.

27

28  (AR 1204).

16

1

2

### B.    The ALJ Erred in Discounting Plaintiff's Testimony and Statements

3

4

Plaintiff contends that the ALJ failed to provide specific, clear and convincing reasons for discounting plaintiff's allegations of pain and dysfunction.

5

#### 1.    Summary of Plaintiff's Testimony and Statements

6

7

8

9

10

Plaintiff testified that she stopped working due to cervical pain and numbness and subsequently had surgery.  (AR 48).  Plaintiff said that she did not feel better after the surgery, she had more pain and had an EMG in November of 2018 (that was not in the record), and her doctor (Dr. Farrukh) said she would need another spine surgery.  (AR 56-57).

11

12

13

14

15

16

17

18

19

20

Plaintiff testified that she could not return to her prior work because she has severe limitation in her neck range of motion with pain radiating down her shoulders, which limits her ability to sit.  (AR 49-50).  Plaintiff said that she has pinched nerves that create radiating pain to her shoulders, and she has a bad shoulder, which limits her ability to reach overhead.  (AR 52-53).  Plaintiff also said she has severe pain in her mid-back and that her pain medications do not completely remove the pain.  (AR 57-58).  Plaintiff said she could look to her feet but not to waist level, and she could trim her toenails.  (AR 51).  Plaintiff said she also has trouble bending over completely.  (AR 52).   Plaintiff did not testify that she has any leg problems or weakness.  (AR 48-58).

21

22

23

24

25

Plaintiff testified that she lives alone and could do her household chores slowly.  (AR 52).  Plaintiff could drive to appointments but tried not to drive due to her limited range of motion.  (AR 53).  On a typical day she gets up, showers, and takes naps because she does not sleep more than four hours at night due to pain.  (AR 59-60).[14]

26

///

27

28

[14]In a Function Report - Adult form dated February 6, 2018 (two months after her spine surgery), plaintiff reported that she then lived with her husband, could not twist or bend, and could not sit or stand for a long period due to lower back and neck pain.  (AR 292-99).

1

### 2.   Pertinent Law

2   When determining disability, an ALJ is required to consider a claimant's

3   impairment-related pain and other subjective symptoms at each step of the

4   sequential evaluation process.  20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d).

5   Accordingly, when a claimant presents "objective medical evidence of an

6   underlying impairment which might reasonably produce the pain or other

7   symptoms [the claimant] alleged," the ALJ is required to determine the extent to

8   which the claimant's statements regarding the intensity, persistence, and limiting

9   effects of his or her subjective symptoms ("subjective statements" or "subjective

10   complaints") are consistent with the record evidence as a whole and, consequently,

11   whether any of the individual's symptom-related functional limitations and

12   restrictions are likely to reduce the claimant's capacity to perform work-related

13   activities.  20 C.F.R. §§ 404.1529(a), (c)(4), 416.929(a), (c)(4); SSR 16-3p, 2017

14   WL 5180304, at *4-10.[15]

15   When an individual's subjective statements are inconsistent with other

16   evidence in the record, an ALJ may give less weight to such statements and, in

17   turn, find that the individual's symptoms are less likely to reduce the claimant's

18   capacity to perform work-related activities.  See SSR 16-3p, 2017 WL 5180304, at

19   *8.  In such cases, when there is no affirmative finding of malingering, an ALJ

20   may "reject" or give less weight to the individual's subjective statements "only by

21   providing specific, clear, and convincing reasons for doing so."  Brown-Hunter,

22   806 F.3d at 488-89.  This requirement is very difficult to satisfy.  See Trevizo, 871

23   ///

24

25

26   [15]Social Security Ruling 16-3p superseded SSR 96-7p and, in part, eliminated use of the
term "credibility" from SSA "sub-regulatory policy[]" in order to "clarify that subjective

27   symptom evaluation is not an examination of an individual's [overall character or truthfulness]
 . . . [and] more closely follow [SSA] regulatory language regarding symptom evaluation."  See

28   SSR 16-3p, 2017 WL 5180304, at *1-2, *10-11.

1   F.3d at 678 ("The clear and convincing standard is the most demanding required in

2   Social Security cases.") (citation and quotation marks omitted).

3          An ALJ's decision "must contain specific reasons" supported by substantial

4   evidence in the record for giving less weight to a claimant's statements.  SSR 16-

5   3p, 2017 WL 5180304, at *10.  An ALJ must clearly identify each subjective

6   statement being rejected and the particular evidence in the record which

7   purportedly undermines the statement.  Treichler, 775 F.3d at 1103.  "General

8   findings are insufficient[.]"  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)

9   (citations omitted).

10          If an ALJ's evaluation of a claimant's statements is reasonable and is

11   supported by substantial evidence, it is not the court's role to second-guess it.  See

12   Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).  When

13   an ALJ fails properly to discuss a claimant's subjective complaints, however, the

14   error may not be considered harmless "unless [the Court] can confidently conclude

15   that no reasonable ALJ, when fully crediting the testimony, could have reached a

16   different disability determination."  Stout, 454 F.3d at 1056; see also Brown-

17   Hunter, 806 F.3d at 492 (ALJ's erroneous failure to specify reasons for rejecting

18   claimant testimony "will usually not be harmless").

19                              **3.    Analysis**

20          The ALJ summarized plaintiff's statements and testimony regarding her

21   impairments and found that plaintiff's medically determinable impairments could

22   reasonably be expected to cause the alleged symptoms, but plaintiff's statements

23   about the intensity, persistence, and limiting effects of the symptoms were not

24   entirely consistent with the medical evidence and other evidence in the record.

25   (AR 27-28).  The ALJ reasoned that plaintiff's allegations were inconsistent with

26   her reported daily activities, with the objective medical evidence, and with

27   plaintiff's self-reports to providers contained therein.  (AR 28-29).  On the current

28   ///

1  record, these reasons are not specific, clear, and convincing reasons supported by
2  substantial evidence to discount plaintiff's statements.

3       Turning first to plaintiff's daily activities, the ALJ generally found
4  plaintiff's activities inconsistent with her allegations, noting that plaintiff's
5  reported daily activities consisted of living alone, showering and doing self care,
6  napping, doing some light household chores (*e..g.,* sweeping and mopping which
7  caused pain, preparing sandwiches and using the microwave) with help, bending
8  to trim her toenails, and being able to drive for her medical appointments.  (AR
9  27-29, 32).

10      The ALJ's general finding that plaintiff's collective daily activities are
11 inconsistent with the alleged severity of some or all of plaintiff's subjective
12 complaints is not sufficiently specific to permit the Court to determine whether the
13 ALJ rejected plaintiff's subjective complaints on any permissible ground.  See
14 Treichler, 775 F.3d at 1103 ("ALJ must identify the testimony that was not
15 credible, and specify 'what evidence undermines the claimant's complaints.")
16 (citation omitted); see also Brown-Hunter, 806 F.3d at 494 (legal error where ALJ
17 failed to identify specific testimony found not credible and failed to "link that
18 testimony to the particular parts of the record supporting [ALJ's] non-credibility
19 determination") (citation omitted).  In this case, the daily activities the ALJ cited
20 are not so extensive on their own to clearly undermine plaintiff's testimony and
21 statements without further explanation.  See Revels v. Berryhill, 874 F.3d 648,
22 667-68 (9th Cir. 2017) (ALJ erred in finding disparity between claimant's reported
23 daily activities and symptom testimony where the claimant indicated she could use
24 the bathroom, brush her teeth, wash her face, take her children to school, wash
25 dishes, do laundry, sweep, mop, vacuum, go to doctor's appointments, visit her
26 mother and father, cook, shop, get gas, and feed her dogs, where the ALJ failed to
27 acknowledge the claimant's explanation consistent with her symptom testimony
28 ///

1 that she could complete only some tasks in a single day and regularly needed to
2 take breaks).  Accordingly, this reason is inadequate.

3        Looking to the medical evidence, "[a]lthough lack of medical evidence
4 cannot form the sole basis for discounting pain testimony, it is a factor that the
5 ALJ can consider . . . ." <u>Burch</u>, 400 F.3d at 681.  Here, the ALJ's reasoning that
6 the medical evidence does not support plaintiff's limitations  – even if it could
7 serve as the sole basis for discounting plaintiff's statements – incorrectly
8 characterizes the record in several respects and otherwise is not supported by
9 substantial evidence.

10        Specifically, the ALJ found that although plaintiff complained of bilateral
11 leg and knee pain, her imaging reports repeatedly were normal/negative, and there
12 assertedly was only a "single" positive straight leg raising examination in
13 evidence, and during that examination plaintiff had a normal gait and station.  <u>See</u>
14 AR 28 (failing to cite to any medical record).  As detailed above, the record is
15 missing lumbar and thoracic MRI studies which reportedly showed mild disc
16 disease at L2-L3 and L5-S1 (AR 1323), the ALJ found that plaintiff suffers from
17 severe sciatica (AR 17), and, perhaps more significantly, the record contains
18 <u>several</u> reports of positive straight leg raising testing by plaintiff's neurosurgeons
19 both before and after surgery.  <u>See</u> AR 498, 501, 505, 575, 1075, 1104, 1186, 1330
20 (positive straight leg raising findings in the record).  Curiously, elsewhere in the
21 decision, the ALJ recognized these other positive straight leg raising findings.  <u>See</u>
22 AR 21 (summarizing the medical record suggesting positive straight leg raising on
23 February 14, 2018, citing generally exhibit 10F); AR 26 (observing that after
24 surgery plaintiff "continues to have positive straight leg raising on exam," citing,
25 <u>e.g.</u>, generally exhibit 9F).

26        The ALJ also cited to the asserted fact that there was no EMG or other
27 neurological evidence to confirm radiculopathy after plaintiff's spine surgery to
28 support plaintiff's complaints of leg and knee pain, but again the ALJ found that

1  plaintiff suffers from severe sciatica, status post surgery, which could explain her

2  pain. (AR 17, 28). Elsewhere in the decision, the ALJ observed that on January

3  23, 2019, plaintiff's neurosurgeon reported that plaintiff had a positive EMG for

4  radiculopathy (see AR 22 (citing generally exhibit 19F)). On this record, this

5  reason for discounting plaintiff's statements is neither clear nor convincing.

6      The ALJ also cited plaintiff's testimony that she had difficulty reaching

7  overhead due to right shoulder problems, but found no objective imaging in

8  evidence to confirm a medically determinable impairment affecting plaintiff's

9  right shoulder joint. (AR 30). This is not a fair characterization of the record. As

10  detailed above, a January 2018 right shoulder x-ray showed mild degenerative

11  changes in the acromioclavicular joint with joint space narrowing and subchondral

12  sclerosis. (AR 507). The state agency physicians considered this x-ray (see, e.g.,

13  AR 79), and opined that plaintiff should be limited to no overhead work (see AR

14  84) – a limitation the ALJ adopted. While it thus appears that the ALJ did not

15  actually rely on an asserted lack of objective evidence to support a right shoulder

16  limitation, to the extent the ALJ generally relied on this asserted lack of support to

17  discount plaintiff's statements this reasoning is neither clear nor convincing.

18      Finally, turning to the asserted inconsistencies between plaintiff's

19  complaints and her reports to treating providers, while an ALJ may rely on such

20  inconsistencies to discount a claimant's allegations, see Light v. Social Security

21  Administration, 119 F.3d 789, 792 (9th Cir.), as amended (1997) (in weighing

22  plaintiff's credibility, ALJ may consider "inconsistencies either in [plaintiff's]

23  testimony or between [her] testimony and [her] conduct"); see also Fair v. Bowen,

24  885 F.2d 597, 604 n.5 (9th Cir. 1989) (ALJ can reject pain testimony based on

25  contradictions in plaintiff's testimony), substantial evidence does not support the

26  ALJ's reasoning here.

27      The ALJ cited plaintiff's testimony complaining of *right* shoulder pain but

28  noted that the record suggested that in 2019 plaintiff complained of *left* shoulder

22

pain.  (AR 29 (citing generally exhibit 19F)).  This is not a fair characterization of the record.  As detailed above, plaintiff complained of radiating pain to *both* of her shoulders after her surgery, and her complaints about greater left shoulder pain than right followed right shoulder trigger point injections.  <u>See</u> AR 495, 497, 500, 1074, 1103, 1129, 1186, 1276, 1304, 1309 1318, 1323.

The ALJ also cited plaintiff's admission to her neurosurgeon that her pain was "on and off" after her surgery, versus her complaint to her primary provider that her pain was ongoing despite her surgery.  (AR 29 (citing generally exhibits 10F and 12F)).  The record contains only one treatment note reporting that plaintiff's pain was "on and off" (<u>see</u> AR 1103), the remainder of treatment records reflect ongoing complaints of pain after plaintiff's surgery, relieved or made tolerable with pain medication/management, and not one note reports that plaintiff had no pain.

The ALJ also cited plaintiff's testimony that she could barely turn her head to look left or right because of her cervical spine fusion, but range of motion examinations assertedly "confirm[ed] she still has functional range of motion in her neck/cervical spine."  (AR 29 (failing to cite to any basis for this conclusion)).  It is unclear how the ALJ determined from the testing, which generally reported pain on range of motion and restricted range of motion in the cervical spine, that plaintiff had "functional range of motion" – there is no consultative examination in the record beyond the psychological examination to opine about plaintiff's cervical range of motion, the state agency physicians did not opine specifically about plaintiff's cervical range of motion, and Dr. Farrukh opined that plaintiff had "significant restriction of range [of] motion in cervical spine and lumbar spine."  (AR 1204).  An ALJ cannot properly rely on the ALJ's own lay knowledge to make medical interpretations of examination results or to determine the severity of medically determinable impairments.  <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d at 1102-03; <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (2d Cir. 1998); <u>see also</u>

1    Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the

2    temptation to play doctor and make their own independent medical findings");

3    Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden

4    from making his or her own medical assessment beyond that demonstrated by the

5    record).

6          The ALJ's incorrect (and inconsistent) characterizations of the record

7    undercut the validity of the ALJ's decision and alone warrant a remand.  See

8    Regennitter v. Commissioner of Social Security Administration, 166 F.3d 1294,

9    1297 (9th Cir. 1999) (finding based on "inaccurate characterization of the

10   evidence" not "clear and convincing" reason for rejecting claimant's statements

11   regarding symptoms; an ALJ's material mischaracterization of the record can

12   warrant remand); Reddick, 157 F.3d at 722-23 (error for ALJ to paraphrase record

13   evidence in manner that is "not entirely accurate regarding the content or tone of

14   the record"); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (ALJ may

15   not selectively rely on only the portions of record which support non-disability)

16   (citations omitted); see generally Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th

17   Cir. 1984) (ALJ must provide an explanation when he rejects "significant

18   probative evidence") (citation omitted).

19         For all the foregoing reasons, the ALJ failed to provide specific, clear and

20   convincing reasons supported by the record to discount plaintiff's subjective

21   symptom statements.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**V.    CONCLUSION**

For the foregoing reasons,[16] the decision of the Commissioner of Social Security is REVERSED and this matter is REMANDED for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: June 21, 2022

_____/s/_____

Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

---

[16]The Court need not, and has not adjudicated plaintiff's other challenges to the ALJ's decision, except insofar as to determine that a reversal and remand for immediate payment of benefits would not be appropriate.  When a court reverses an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and quotations omitted); Treichler, 775 F.3d at 1099 (noting such "ordinary remand rule" applies in Social Security cases) (citations omitted).